Filed 9/29/21  P. v. Castillo-Lopez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br> v.<br><br>ALBERTO CASTILLO-LOPEZ,<br><br>  Defendant and Appellant. | D078829<br><br><br>(Super. Ct. No. C1912849)<br><br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

The opinion filed September 23, 2021, is hereby modified as follows:

1.     On page 14, within the citation on the last two lines of the second paragraph, insert "(*McCoy*)" after the pincite page and before the bracketed quote, so that the citation now begins:  "(*People v. McCoy* (1944) 25 Cal.2d 177, 193 (*McCoy*) . . . ."

2.     On page 15, footnote 6, the sentence beginning: "In light of our reversal based on prejudicial instructional error" is deleted, and the following sentences are inserted in its place:

The parties have extensively briefed the issue. Castillo-Lopez's argument lacks merit. As " '[t]he drawing of a weapon is generally evidence of an intention to use it' " (*McCoy, supra*, 25 Cal.2d at p. 193), one reasonable interpretation of the evidence is that by unsheathing and holding up the machete, Castillo-Lopez was in the process of putting the machete to use as a weapon against M.M., such as by swinging it, but he was too intoxicated to do so in an efficient and effective manner. Therefore, although such a finding is certainly not *required* by the evidence presented at trial, the record does contain substantial evidence to permit a reasonable juror to find that Castillo-Lopez used the machete "in such a way that it [was] capable of causing and likely to cause death or great bodily injury." (CALCRIM No. 3145.)

Appellant's petition for rehearing is denied.

There is no change in judgment.

HUFFMAN, Acting P. J.

Copies to: All parties

Filed 9/23/21  P. v. Castillo-Lopez CA4/1 (unmodified opinion)
# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D078829 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. C1912849) |
| ALBERTO CASTILLO-LOPEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Santa Clara County, Andrea E. Flint and Julianne Sylva, Judges.  Affirmed in part, reversed in part, and remanded with directions.

Evan C. Greenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Eric D. Share and Ashley Harlan, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Alberto Castillo-Lopez guilty of one count of attempted second degree robbery (Pen. Code, §§ 212.5, subd. (c), 664),[1] with a further finding that he personally used a deadly or dangerous weapon (a machete) (§ 12022, subd. (b)(1)); and one count of misdemeanor resisting, delaying or obstructing a peace officer (§ 148, subd. (a)(1)). The trial court suspended imposition of sentence and ordered that Castillo-Lopez be placed on probation for a term of three years. The trial court also imposed certain fines and fees.

Castillo-Lopez makes several arguments on appeal. First, he seeks reversal of the true finding that he personally used a deadly or dangerous weapon in committing the attempted robbery. Specifically, he contends that (1) the jury was prejudicially misinstructed as to that enhancement, and (2) in any event, substantial evidence does not support a true finding on the enhancement. Second, according to Castillo-Lopez, the trial court abused its discretion in admitting evidence that (1) he possessed a piece of metal wire when he was arrested that was possibly a burglary tool, and (2) as he walked away from the attempted robbery, he was seen peering into cars. Third, Castillo-Lopez argues the jury should have been instructed that it could consider voluntary intoxication in connection with the charge that he resisted, delayed or obstructed a peace officer. Fourth, he contends the jury should have been instructed on brandishing (§ 417, subd. (a)(1)) as a lesser included offense to the attempted robbery charge. Fifth, due to a recent statutory amendment to section 1203.1, subdivision (a), Castillo-Lopez seeks a reduction of his term of probation to two years. Finally, Castillo-Lopez argues that based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*),

---

[1]    Unless otherwise indicated, all further statutory references are to the Penal Code.

2

the trial court did not adequately take into account his inability to pay when imposing certain fines and fees.

We conclude (1) the trial court prejudicially erred in instructing on the enhancement for personally using a deadly or dangerous weapon for the attempted robbery count, and (2) Castillo-Lopez should be resentenced consistent with the two-year limitation on terms of felony probation set forth in the current version of section 1203.1, subdivision (a).  Further, with respect to Castillo-Lopez's inability to pay the fines and fees imposed at sentencing, the record is unclear as to whether the trial court considered the constitutional principles set forth in *Dueñas* and subsequent case law.  We find no merit to Castillo-Lopez's remaining contentions.  Accordingly, we reverse the true finding on the one-year enhancement for personally using a deadly or dangerous weapon, and on remand we direct the trial court to (1) resentence Castillo-Lopez in a manner consistent with the current version of section 1203.1, subdivision (a); and (2) expressly consider whether, in light of Castillo-Lopez's inability to pay, it should reduce or strike certain of the fines and fees imposed at sentencing.

I.

FACTUAL AND PROCEDURAL BACKGROUND

On the afternoon of July 2, 2019, after finishing her shift at work in an industrial area of San Jose, M.M. walked with her sister to her sister's car, which was parked near the entrance to their workplace.  M.M. carried a purse and a lunch box, which she planned to place inside the car.  As M.M. opened the passenger-side door in preparation for placing the items inside, Castillo-Lopez approached M.M. on the sidewalk, physically separated from her by a three-foot wide dirt strip.  While noting that Castillo-Lopez appeared to be one of the homeless people populating the area around her workplace,

3

M.M. nodded to Castillo-Lopez in a cordial manner. Castillo-Lopez held something in his hands, but, at that point, M.M. could not tell what it was. It was later revealed that the item was a two or three-foot long machete, which was wrapped in a dirty white cloth.

Castillo-Lopez responded to M.M's nodded greeting by raising his eyebrows and making head nudges while looking at her purse, which she held in her hand. Castillo-Lopez mumbled, "Give me. Give me it." M.M. perceived that Castillo-Lopez wanted her purse, and she reacted by saying "No." Castillo-Lopez responded by nodding his head, as if to indicate "Yes." M.M. then threw her purse in the car and slammed the door shut.

Castillo-Lopez took the machete, still wrapped in the white cloth, and slapped it against his left palm two times. He seemed angry, and the gesture was intimidating to M.M. As M.M. created distance from Castillo-Lopez by walking toward the rear of the car, Castillo-Lopez unsheathed the machete from the white cloth.

According to M.M., after Castillo-Lopez unsheathed the machete, "[h]e raised it up to show us—it was pointed towards the sky, blade down," and "he was just shaking it, showing me." M.M. was approximately 10 feet away from Castillo-Lopez at that point. The machete was old and rusty, but its edge appeared to be sharp. A police officer testified at trial that although the primary use of a machete is to chop down foliage, a machete can be used to cause bodily injury such as dismemberment or other life-threatening injuries.

After Castillo-Lopez displayed the machete, M.M. took her cell phone from her pocket, and Castillo-Lopez said, "Call the cops." M.M. responded, "Yeah, I am calling the cops." Castillo-Lopez then took several steps forward through the dirt strip beside the sidewalk. M.M. confirmed during her

4

testimony that Castillo-Lopez did not swing or point the machete at her, and he did not make any verbal threats to use the machete to hurt her.

M.M. alerted her sister, who was standing near the driver's door of the car but had not previously been paying attention. According to M.M.'s sister, she looked up and saw Castillo-Lopez with the machete, and "[h]e was just holding it and he waved it." She explained that Castillo-Lopez was holding the machete "[d]ownward, but when I went to look . . . he went up with it, like that, with a smile." When asked whether she meant to indicate by her gestures that Castillo-Lopez raised the machete to shoulder height, M.M.'s sister stated, "It wasn't that high because he was intoxicated; so it seemed really heavy for him to hold, but he had it." M.M.'s sister saw Castillo-Lopez start to approach as he "waved" the machete. M.M. and her sister ran into their workplace building, locking the door behind them. M.M.'s sister called 911.

Immediately afterwards, one of M.M's co-workers armed himself with a bat and went outside to confront Castillo-Lopez, who eventually left the scene. Later, M.M.'s sister exited the building and saw Castillo-Lopez walking in the distance while stopping to peer into the windows of parked cars. He was stumbling and not walking straight.

Uniformed police officers in marked patrol cars, with lights flashing and sirens sounding, responded to the 911 call and located Castillo-Lopez in a nearby strip mall. Castillo-Lopez initially did not comply with police commands to stop walking away and to get down on the ground. Then, when officers forced Castillo-Lopez to the ground and attempted to handcuff him, Castillo-Lopez tensed his arms in a raised position to make it difficult to apply handcuffs. After Castillo-Lopez was handcuffed, officers discovered that he was holding a piece of metal wire, which an officer testified was of the

5

type typically used as a burglary tool to pick locks or ignitions. Castillo-Lopez's pockets held a pocket knife and a hacksaw blade.

An information charged Castillo-Lopez with one count of attempted second degree robbery (§§ 212.5, subd. (c), 664) and one count of the misdemeanor offense of resisting, delaying or obstructing a peace officer. (§ 148, subd. (a)(1).) For the attempted robbery count it was alleged that Castillo-Lopez personally used a deadly or dangerous weapon (a machete). (§ 12022, subd. (b)(1).)

The jury found Castillo-Lopez guilty on both counts and made a true finding on the weapon enhancement. At sentencing on December 16, 2019, the trial court suspended imposition of sentence, placed Castillo-Lopez on probation for a term of three years, and imposed certain fines and fees. On January 23, 2020, a hearing was held at which the trial court found that Castillo-Lopez violated the conditions of probation, and ordered that Castillo-Lopez serve a six-month jail term.

II.

DISCUSSION

A.    *The Trial Court Prejudicially Erred by Instructing That the Machete Could Be an Inherently Deadly or Dangerous Weapon for the Purpose of the Weapon Enhancement*

We first consider Castillo-Lopez's contention that the trial court prejudicially erred in its instruction on the enhancement for personal use of a deadly or dangerous weapon in connection with the attempted robbery count. More specifically, the issue is whether prejudicial error occurred when the trial court instructed on the theory that the jury could find the machete used by Castillo-Lopez to be an *inherently* deadly or dangerous weapon. As we will explain, although the parties agree that the trial court erred, they disagree on whether the error was prejudicial.

6

We begin with the relevant statutory provision.  Section 12022, subdivision (b)(1) provides, "A person who personally uses a deadly or dangerous weapon in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for one year, unless use of a deadly or dangerous weapon is an element of that offense."  The jury was instructed with CALCRIM No. 3145 as follows with respect to that enhancement:

> "• If you find the defendant guilty of the crime charged in Count 1, you must then decide whether the People have proved the additional allegation that the defendant personally used a deadly or dangerous weapon during attempted commission of that crime.
>
> "• *A deadly or dangerous weapon is* any object, instrument, or weapon that is inherently deadly or dangerous or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury.
>
> "• *Great bodily injury* means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm."

Case law establishes a weapon may qualify as a deadly or dangerous weapon under this enhancement in two ways:  (1) the weapon used by the defendant may be *inherently* deadly or dangerous; or (2) although not inherently dangerous, the weapon may be *used* by the defendant in a manner that qualifies it as a deadly or dangerous weapon.  (*People v. Aledamat* (2019) 8 Cal.5th 1, 6 (*Aledamat*).)[2]  The concept of an *inherently* deadly or dangerous weapon as used in section 12022, subdivision (b)(1) is a term of art

[2]    The same approach applies when the issue is whether the defendant has used a "deadly" weapon in committing an assault.  (*Aledamat, supra*, 8 Cal.5th at p. 6, fn. 2.)  Thus, our analysis refers interchangeably to case law arising in both contexts.

7

that does not necessarily reflect the common meaning of the phrase. Specifically, " 'inherently deadly or dangerous' " weapons are objects that are deadly or dangerous in " 'the ordinary use for which they are designed,' " meaning they lack any practical, nondeadly/nondangerous purpose and are not commonly "used for innocent purposes." (*Aledamat*, at p. 6.) Applying this definition, case law has determined that certain weapons, like dirks and blackjacks, are inherently deadly as a matter of law (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1029), while others, like knives and box cutters, are not. (*In re B.M.* (2018) 6 Cal.5th 528, 533 (*B.M.*) [knife]; *Aledamat*, at p. 6 [box cutter]; see also *People v. McCoy* (1944) 25 Cal.2d 177, 188 [noting the "distinction between instrumentalities which are 'weapons' in the strict sense of the word, such as guns, dirks, etc., and those instrumentalities which are not weapons in that sense, such as ordinary razors, pocket-knives or other sharp objects"].) "[M]ost objects are not inherently deadly even if they may be used in a way that makes them deadly." (*Aledamat*, at pp. 15-16.) As a matter of law, a machete is indisputably *not* an inherently deadly or dangerous weapon, and the parties do not contend otherwise. This is because a machete is essentially a large specialized knife with the useful purpose of chopping foliage.

It is well-established that a trial court errs if it instructs jurors that they may find a weapon to be inherently deadly or dangerous, when, as a matter of law, the weapon is *not* inherently deadly or dangerous. (*Aledamat*, *supra*, 8 Cal.5th at pp. 6-7 [because " '[a] box cutter' " "is not an inherently deadly weapon as a matter of law," "the trial court erred in presenting the jury with two theories by which it could find the box cutter a deadly weapon: (1) inherently or (2) as used," as "[t]he first theory (inherently) is incorrect."].) Such an instruction is "flawed because [it] suggest[s] the jury might properly

8

conclude that a [weapon] is inherently dangerous," when it cannot be so as a matter of law. (*People v. Stutelberg* (2018) 29 Cal.App.5th 314, 317 (*Stutelberg*).)

The People concede that the trial court erred by including the portion of CALCRIM No. 3145 stating that a deadly or dangerous weapon is any object, instrument, or weapon "that is inherently deadly or dangerous." As the People explain, " '[b]ecause the trial court here did not define what "inherently deadly" meant, the jury would not [have been] equipped to know that, contrary to what the instruction suggested, a [machete] is *not* an inherently deadly weapon.' "

Although the parties agree that the trial court committed instructional error, they disagree as to whether the error was prejudicial. In *Aledamat*, our Supreme Court established that for the type of error at issue here, "the usual 'beyond a reasonable doubt' standard of review established in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) for federal constitutional error applies. The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*Aledamat, supra*, 8 Cal.5th at p. 3.)[3] As

---

[3]    *Aledamat* concerned the exact type of instructional error that occurred here. The defendant pulled out a box cutter, thrust it at the victim and threatened to kill him. (*Aledamat, supra*, 8 Cal.5th at p. 4.) In instructing on the charge of assault with a deadly weapon and the weapon enhancement for personally using a deadly or dangerous weapon (§ 12022, subd. (b)(1)), the trial court erred by instructing the jury it could find the box cutter to be an *inherently* deadly or dangerous weapon. (*Aledamat*, at pp. 6-7.) As here, the issue in *Aledamat* was whether the error was prejudicial. All seven justices in *Aledamat* agreed that the general harmless error inquiry set forth in *Chapman, supra*, 386 U.S. at page 24, applied to the type of error that had

9

Justice Cuéllar pointed out in his concurring and dissenting opinion in *Aledamat*, there are two helpful analytical approaches to determining whether such an instructional error was prejudicial: "we can conclude 'beyond a reasonable doubt' either that the jury necessarily relied on a valid legal theory [citations] *or* that the element omitted or misdescribed 'was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error.' " (*Aledamat*, *supra*, 8 Cal.5th at p. 17 (conc. & dis. opn. of Cuéllar, J.), italics omitted.) We proceed by applying both of those inquiries.

1. *We Cannot Conclude the Jury Relied on a Valid Legal Theory for Finding the Machete to Be Deadly or Dangerous*

Turning to the first of these inquiries, we cannot conclude beyond a reasonable doubt that, although misinstructed, the jury relied on a valid legal theory in finding the machete to be a deadly or dangerous weapon, namely that the machete was "used in such a way that it [was] capable of causing and likely to cause death or great bodily injury." (CALCRIM No. 3145.) As we will explain, our conclusion is based on two main considerations.

First, based on the argument of counsel, there is a reasonable possibility that the jury relied on the invalid legal theory that the machete was inherently deadly or dangerous. Specifically, during closing argument, the prosecutor addressed the issue of whether the machete was deadly or dangerous by referring *only* to the theory that it was inherently deadly or dangerous. Referring to the machete, she argued, "[t]hat item is inherently

---

occurred. (*Aledamat,* at pp. 13, 16 (conc. & dis. opn. of Liu, J.), 17-18 (conc. & dis. opn. of Cuéllar, J.).) However, based on a combination of (1) the totality of the jury instructions, (2) the content of counsel's argument to the jury, and (3) the findings the jury necessarily made in arriving at an assault conviction, a four-justice majority in *Aledamat* determined that the error was not prejudicial. (*Id*. at pp. 13-16.)

10

dangerous," and she then reminded the jury of the police officer's testimony describing how a machete could cause damage, including dismemberment. (See *In re Martinez* (2017) 3 Cal.5th 1216, 1226-1227 [concluding the jury could have convicted on an invalid legal theory where the prosecutor extensively argued that theory to the jury during closing argument].) Significantly, the prosecutor said *nothing* about whether the machete was deadly or dangerous based on how Castillo-Lopez actually used it. Defense counsel omitted any discussion during closing argument about whether the machete was a deadly or dangerous weapon. Therefore, the sole guidance the jury received during closing argument as to how they should approach the issue of whether the machete was deadly or dangerous was that they should find it to be *inherently* deadly and dangerous.

Next, having been urged by the prosecutor to conclude that the machete was *inherently* deadly or dangerous, there is a significant possibility that the jury accepted the approach proposed by the prosecutor and found that the machete *was* inherently deadly or dangerous. Significantly, the phrase "inherently deadly or dangerous" was not defined for the jury. Accordingly, the phrase would likely be understood by an average person as denoting an object that is "inherently" deadly or dangerous if it is the type of object that, by its very nature, is obviously capable of causing harm or death. Because a machete is a long and sharp cutting tool, most people would conclude that a machete satisfies that definition. (*Aledamat*, *supra*, 8 Cal.5th at p. 15 [describing the risk that "because the court did not define the term, the jury might have applied its common understanding to find the box cutter deadly because it is sharp and used for cutting"].) Even a passing glance at a machete reveals that it could do significant harm if swung at another human being. Any reasonable person would understand that it is necessary to avoid

11

the path of a machete to prevent from being injured, even when a machete is being used for the innocent purpose of chopping foliage. Moreover, a person's manner of using a machete does not change depending on whether it is used for its intended plant-cutting purposes as opposed to its non-intended purpose as a weapon. In both instances, a person raises the machete and swings it with a chopping motion, with the only difference being the target at which the machete is directed. Because of these characteristics, there is a significant possibility that, consistent with the prosecutor's suggestion, the average juror would classify a machete as an *inherently* deadly or dangerous weapon based on the common meaning of that phrase.[4]

---

[4] We note that our Supreme Court in *Aledamat* determined that although instructed on the theory that the box cutter could be *inherently* deadly or dangerous, the totality of the circumstances established that the jury would not have found the box cutter to be deadly or dangerous without also considering *how* the box cutter was used by the defendant. In so holding, *Aledamat* relied on an additional jury instruction given in that case. The jury was told, " 'In deciding whether an object is a deadly weapon, consider all of the surrounding circumstances including when and where the object was possessed and any other evidence that indicates whether the object would be used for a dangerous rather than a harmless purpose.' " (*Aledamat*, *supra*, 8 Cal.5th at p. 14.) As *Aledamat* explained, "This part of the instruction suggested the question was unitary, that is, that the jury had to consider *all of the circumstances* in deciding whether the object was a deadly weapon, *either* inherently *or* as used. The jury would likely view the 'inherently deadly' language in light of this additional instruction that it had to consider all of the circumstances. Given this additional instruction, it seems unlikely the jury would simply view the box cutter as inherently deadly without considering the circumstances, including how defendant used it." (*Id.* at p. 14, first italics added.) No such instruction in the instant case served to focus the jury on how the machete was used. Thus, the jury here was unquestionably presented with the binary choice of deciding *either* that the machete was inherently deadly or dangerous *or* that it was deadly and dangerous based on how Castillo-Lopez used it.

In sum, for these reasons we cannot conclude beyond a reasonable doubt that, although misinstructed, the jury relied on a valid legal theory in finding the machete to be a deadly or dangerous weapon.

2. *The Evidence that the Machete Was Deadly or Dangerous as Used Was Not So Overwhelming as to Render the Instructional Error Harmless Beyond a Reasonable Doubt*

The second relevant inquiry in our harmless error analysis is whether the evidence that the machete was deadly or dangerous *as used* was so overwhelming that it made no difference that the jury was incorrectly instructed that the machete could be an inherently deadly or dangerous weapon. (*Aledamat*, *supra*, 8 Cal.5th at p. 17 (conc. & dis. opn. of Cuéllar, J.).) To answer that question we must further explore what it means *to use* an item as a deadly or dangerous weapon.

As the jury was instructed, it could find the machete to be deadly or dangerous *as used* if it found that the machete was "used in such a way that it [was] capable of causing and *likely to cause* death or great bodily injury." (CALCRIM No. 3145, italics added.) Consistent with this description, our Supreme Court has explained that "for an object to qualify as a deadly weapon based on how it was used, the defendant must have used the object in a manner not only capable of producing but also *likely to produce* death or great bodily injury. The extent of any damage done to the object and the extent of any bodily injuries caused by the object are appropriate considerations in the fact-specific inquiry . . . . But speculation without record support as to how the object could have been used or what injury might have been inflicted if the object had been used differently is not

13

appropriate." (*B.M.*, *supra*, 6 Cal.5th at p. 530.)[5] "[T]he determination of whether an object is a deadly weapon . . . must rest on evidence of how the defendant actually 'used' the object." (*Id.* at p. 534.) Thus, for instance, in *B.M.* when the defendant stabbed a butter knife into the victim's blanketed legs, the evidence was insufficient to show that the butter knife was used as a deadly weapon. Focusing on how the knife was actually used, our Supreme Court explained, "[i]t may be that [the defendant] could have caused serious injury if she had applied greater force, if she had applied the same force to [the victim's] exposed legs, if she had used the knife on [the victim's] head, face, or neck, or if [the defendant] had wielded the knife in an uncontrolled or unpredictable manner. But the inquiry must focus on the evidence of how [the defendant] *actually used* the knife, not on various conjectures as to how she *could have used it*." (*Id.* at p. 538, italics added.)

Here, the evidence was that Castillo-Lopez held up the machete with the blade facing *downward*. M.M. perceived that Castillo-Lopez "raised [the machete] up to *show*" it to her. (Italics added.) Although Castillo-Lopez eventually took several steps forward, M.M. confirmed that Castillo-Lopez did not swing the machete at her, point it at her or make any verbal threats to use the machete to hurt her. As she explained, "[H]e was just shaking it, showing me." It is *possible* that a juror could infer that Castillo-Lopez was preparing to employ the machete as a weapon. (*People v. McCoy* (1944) 25 Cal.2d 177, 193 [" 'The drawing of a weapon is generally evidence of an

---

[5]    *B.M.* examined the circumstances under which an object qualifies as a deadly weapon, based on its use, for the crime of assault with a deadly weapon. (*B.M.*, *supra*, 6 Cal.5th at p. 533.) However, as we have noted, the same approach applies in the context of a weapon enhancement for personally using a deadly or dangerous weapon (§ 12022, subd. (b)(1)). (*Aledamat*, *supra*, 8 Cal.5th at p. 6, fn. 2.)

intention to use it.' "]; *B.M.*, *supra*, 6 Cal.5th at p. 533 [" 'In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' "].)  But the evidence certainly does not *require* such a finding.[6]  Indeed, a reasonable finder of fact could conclude, based on the evidence, that by displaying the machete with the tip of the blade facing downward, Castillo-Lopez intended to instill fear in M.M. based on his *possession* of a weapon, but that during his interaction with M.M., he was not wielding the machete as a weapon in a manner "*likely to produce* death or great bodily injury." (*B.M.*, at p. 530.)

Because the evidence is susceptible to an interpretation that Castillo-Lopez raised the machete with the tip of the blade facing downward merely to display it, and thus to scare or threaten M.M., we cannot conclude, beyond a reasonable doubt, that the jury, if correctly instructed, would have found the machete to be a deadly or dangerous weapon, *as used*.  (See *Stutelberg*, *supra*, 29 Cal.App.5th at p. 322 ["The jury could reasonably conclude that [defendant's] 'flicking' motion [with a box cutter] was more of a *threat*, as opposed to an act likely to cause death or great bodily injury.  Under these circumstances, we cannot say that the court's error in instructing the jury regarding an inherently dangerous weapon was harmless beyond a reasonable doubt" (italics added)].)  Put another way, the evidence that Castillo-Lopez *used* the machete as a deadly or dangerous weapon was not so

---

6      On appeal, Castillo-Lopez also argues that the true finding on the weapon enhancement should be reversed on the alternative ground that, even had the jury been correctly instructed, insufficient evidence supports a finding that, *as used*, the machete was a deadly and dangerous weapon.  In light of our reversal based on prejudicial instructional error, we need not, and do not, conduct a detailed analysis of the substantial evidence challenge.

15

overwhelming that we can conclude beyond a reasonable doubt that the outcome would have been the same regardless of the instructional error.

In sum, "after examining the entire cause, including the evidence, and considering all relevant circumstances" (*Aledamat*, *supra*, 8 Cal.5th at p. 3), we cannot conclude that it was harmless beyond a reasonable doubt for the trial court to instruct the jury that it could find the machete to be inherently deadly or dangerous. Accordingly, the instructional error was prejudicial, and we reverse the jury's true finding on the one-year weapon-use enhancement (§ 12022, subd. (b)(1)) attached to the attempted robbery count.

B.   *The Trial Court Did Not Abuse Its Discretion in Admitting Evidence that Castillo-Lopez Held a Possible Burglary Tool When He Was Arrested and That He Peered Into Cars as He Walked Away from the Scene of the Attempted Robbery*

Castillo-Lopez argues that the attempted robbery conviction should be reversed because the trial court abused its discretion in admitting testimony about a possible burglary tool Castillo-Lopez possessed when he was arrested and about his actions as he walked away from the scene of the attempted robbery.

1.   *The Challenged Evidence and Defense Counsel's Objections*

We begin by examining the evidence that Castillo-Lopez contends was improperly admitted, along with defense counsel's objections.

a.   *Evidence That Castillo-Lopez Held a Piece of Metal Wire When He Was Arrested*

When questioning one of the police officers who arrested Castillo-Lopez, the prosecutor elicited testimony that when Castillo-Lopez was handcuffed, he held a piece of metal wire in his hand. The wire was approximately four inches long and had the thickness of two or three paper clips. The prosecutor displayed photographs depicting the piece of metal wire to the jury. The prosecutor then asked the police officer, "[I]n what context do you usually see

16

items like that?" Defense counsel objected to that question on the grounds of relevance and undue prejudice under Evidence Code section 352. After a sidebar conference, the trial court overruled the objections. The police officer replied, "The first thing that comes to mind is burglary tools." He then explained that a burglary tool is "a tool that someone might use to break into something, either a padlock, door lock, ignition, or something of that nature."

At the end of the day's testimony, the trial court and counsel made a record of the sidebar conference during which defense counsel's objections regarding the piece of metal wire were discussed. Defense counsel explained, "I did lodge a relevance objection in regards to the introduction of People's [Exh. No.] 3, which depicts a piece of—call it wire just for now—beige wire, perhaps. I did argue at sidebar that, frankly, this evidence and the opinion that it is a burglary tool is [under Evidence Code section] 352, more prejudicial than probative. I don't think it can be used to go to my client's mental state with regards to Penal Code [section] 211 [i.e., robbery]. I think to make that leap is speculative at best, and I think introduction of this evidence is more prejudicial than probative to Mr. Castillo-Lopez. I don't anticipate we will receive any evidence that Mr. Castillo-Lopez was observed attempting to break into any residences or automobiles with this piece of wire."

The trial court explained why it overruled the objections: "So I did allow the officer to opine as to the purpose of the wire, at least in the officer's mind, because I do believe that it is relevant as it does go partly to the state of the mind of Mr. Castillo-Lopez in terms of his intent to permanently deprive property from someone, whether it be through a robbery or through a burglary. The other thing is he could have just been holding the wire, but it's also possible, seeing the police, he might have intended to use it as a lock

17

pick. But in any event, I find the probative value does not substantially outweigh the prejudicial effect, risk of misleading the jury, or an undue waste of time; so I did allow the evidence into evidence."[7]

        b.     *Evidence That Castillo-Lopez Was Peering Into Parked Cars*

During the testimony of M.M.'s sister, the prosecutor asked her what Castillo-Lopez was doing as he walked away in the distance. Defense counsel made an objection based on relevance, which the trial court overruled.[8] M.M.'s sister replied that while Castillo-Lopez walked past a mechanic's shop, he was "[p]eeking in the cars through the windows as he was walking by. [At s]ome of them he did stop, and hovered his face over in the window."

        2.     *Standard of Review*

Castillo-Lopez contends that the trial court prejudicially erred in admitting this evidence. He argues the evidence was irrelevant, was unduly prejudicial under Evidence Code section 352, and was inadmissible character evidence under Evidence Code section 1101, subdivision (a). " 'We review claims regarding a trial court's ruling on the admissibility of evidence for abuse of discretion.' " (*People v. Henriquez* (2017) 4 Cal.5th 1, 31.) " ' "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a

---

7    Based on the context, in stating "I find the probative value does not substantially outweigh the prejudicial effect," the trial court plainly misspoke and intended to state the opposite, namely, that the prejudicial effect does not substantially outweigh the probative value.

8    In this instance, the off-the-record discussion was not later described for the record.

manifest miscarriage of justice.' " ' " (*People v. Chhoun* (2021) 11 Cal.5th 1, 26 (*Chhoun*).)

   3.    *Castillo-Lopez Failed to Preserve Certain of His Evidentiary Challenges*

Before turning to a discussion of whether the trial court abused its discretion, we must first examine whether Castillo-Lopez sufficiently preserved each of his evidentiary challenges. To preserve an evidentiary challenge for appeal, counsel must raise in the trial court an objection on the specific ground asserted on appeal. (*People v. Rundle* (2008) 43 Cal.4th 76, 116 [" 'Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was "timely made and so stated as to make clear the specific ground of the objection." Pursuant to this statute, " 'we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " ' "]; *People v. Dykes* (2009) 46 Cal.4th 731, 756 ["trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal"].) " 'Although no "particular form of objection" is required, the objection must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." ' " (*People v. Valdez* (2012) 55 Cal.4th 82, 130.) An objection based on relevance and the unduly prejudicial nature of evidence is usually not sufficient to preserve an appellate challenge on the ground that the evidence is inadmissible under Evidence Code section 1101, subdivision (a). (*Valdez*, at p. 130, and cases cited therein.)

19

Here, with respect to evidence about the piece of metal wire, defense counsel's only objections were based on relevance and undue prejudice. Therefore, defense counsel did not preserve an appellate argument that the evidence should have been excluded as inadmissible character evidence under Evidence Code section 1101, subdivision (a). With respect to evidence that Castillo-Lopez was peering into parked cars, defense counsel's only objection was based on relevance. Thus, as to that evidence, he failed to preserve an appellate argument under either Evidence Code section 1101, subdivision (a) or Evidence Code section 352.

Castillo-Lopez argues that despite defense counsel's failure to preserve an objection premised on Evidence Code section 1101, subdivision (a), defense counsel was excused from doing so because any such objection would have been futile. Castillo-Lopez relies on *People v. Gomez* (2018) 6 Cal.5th 243, 286-287, which held that although, at trial, defense counsel may have objected only on the basis of Evidence Code section 352 to the trial court's admission of evidence that the defendant refused to come to court on one morning of trial, defense counsel previously raised extensive objections to that evidence during court hearings, which the trial court overruled in a manner indicating that it "would have rejected any objection to the testimony." (*Gomez*, at p. 287.) Applying a futility analysis as in *Gomez*, Castillo-Lopez argues that because the trial court overruled his *relevance* objections to the evidence, it would have also overruled his objections under Evidence Code section 1101, subdivision (a). As we will explain, the argument lacks merit.

Castillo-Lopez's proposed challenge is based on Evidence Code section 1101, subdivision (a), which states that unless an exception applies, "evidence of a person's character or a trait of his or her character . . . is inadmissible

20

when offered to prove his or her conduct on a specified occasion." (§ 1101, subd. (a).) Specifically, Castillo-Lopez contends that evidence he possessed a burglary tool and was peering into cars constitutes evidence of uncharged "other crimes" amounting to impermissible character evidence, the admission of which is governed by Evidence Code section 1101, subdivision (a). (*People v. Catlin* (2001) 26 Cal.4th 81, 145 ["Section 1101 prohibits the admission of other-crimes evidence for the purpose of showing the defendant's bad character or criminal propensity"].) As Castillo-Lopez points out, under subdivision (b) of section 1101, evidence of a person's other crimes that would otherwise be inadmissible under subdivision (a) may be admitted if "relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than [the person's] disposition to commit such an act." (§ 1101, subd. (b).) Castillo-Lopez observes that the trial court overruled his relevance objections to the challenged evidence by relying on the concept of intent, explaining that "it does go partly to the state of the mind of Mr. Castillo-Lopez in terms of his *intent* to permanently deprive property from someone, whether it be through a robbery or through a burglary." (Italics added.) Based on the trial court's reference to *intent* in overruling his relevance objection, Castillo-Lopez argues that it would have been futile for defense counsel to raise an objection under Evidence Code section 1101, subdivision (a), because the trial court would have found the evidence to fall under the exception in Evidence Code section 1101, subdivision (b) for evidence of other crimes that are relevant to prove *intent*.

This argument fails because two different standards apply for (1) determining that evidence meets the minimal standards of relevancy because it has a tendency to prove intent, and (2) finding that the exception

21

in Evidence Code section 1101, subdivision (b) applies. The test for the relevancy of evidence is not very demanding. " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) In contrast, case law requires courts to apply a more demanding analysis in deciding whether an uncharged crime may be admitted for the purpose of showing intent under Evidence Code section 1101, subdivision (b). " 'In order to be admissible to prove intent, the uncharged conduct must be *sufficiently similar* to support the inference that the defendant " '*probably* harbor[ed] the same intent in each instance.' " ' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1328, italics added.) This approach is based on the recognition that " ' " ' "if a person acts similarly in similar situations, he probably harbors the same intent in each instance" . . . . The inference to be drawn is not that the actor is *disposed* to commit such acts; instead, the inference to be drawn is that, in light of the first event, the actor, at the time of the second event, must have had the intent attributed to him by the prosecution.' " ' " (*Chhoun*, *supra*, 11 Cal.5th at p. 27.)

Accordingly, here, the trial court's determination that the challenged evidence was *relevant* to the issue of intent does not mean that it would have ruled the evidence met the more demanding requirements under Evidence Code section 1101, subdivision (b), had defense counsel asserted an objection under Evidence Code section 1101, subdivision (a). We therefore reject Castillo-Lopez's argument that defense counsel was excused from raising an objection under Evidence Code section 1101, subdivision (a) because it would have been futile to do so.

4. *With Respect to the Evidentiary Rulings Properly Before Us, the Trial Court Did Not Abuse Its Discretion*

Turning to the evidentiary challenges that are properly before us, we first examine whether the trial court abused its discretion in overruling defense counsel's objections to the evidence about the piece of metal wire—a possible burglary tool—that Castillo-Lopez held in his hand when he was arrested. Castillo-Lopez argues the evidence was irrelevant because "[t]he attempted robbery in this case had nothing to do with breaking into a lock or starting a car ignition," and there was no evidence that he did anything to tamper with the car where M.M. placed her purse. The argument lacks merit. A central factual dispute at trial was whether Castillo-Lopez approached M.M. with the intent to take her purse, or, in contrast, whether M.M. misunderstood his intentions. As the trial court reasonably concluded, evidence that Castillo-Lopez had a burglary tool in his possession during the incident is relevant because it has some "tendency in reason to prove" (Evid. Code, § 210) that Castillo-Lopez was walking around the neighborhood with the intention of stealing property, and that M.M. therefore correctly understood that he wanted to take her purse.

Further, the trial court also reasonably overruled the objection made under Evidence Code section 352 that it would be unduly prejudicial to admit evidence about the piece of metal wire. Pursuant to Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id.*) " 'Evidence is substantially more prejudicial than probative . . . only if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings

23

or the reliability of the outcome." ' " (*People v. Tran* (2011) 51 Cal.4th 1040, 1047, brackets omitted.) " ' "The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]'. . . . [E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*People v. Scott* (2011) 52 Cal.4th 452, 491.) Applying these standards here, as we have explained, evidence that Castillo-Lopez had a piece of metal wire that could have been a burglary tool *did* have probative value to a disputed issue. Weighed against that probative value, the possession of a piece of metal wire is a relatively innocuous fact and is therefore not the type of evidence that is especially prejudicial in that it " ' "uniquely tends to evoke an emotional bias against the defendant" ' " or that "is of such nature as to inflame the emotions of the jury." (*Ibid.*) Accordingly, we find no merit to the contention that the trial court abused its discretion in overruling the objection based on Evidence Code section 352.

We also find no merit to Castillo-Lopez's challenge to the trial court's admission, over defense counsel's relevance objection, of testimony that he was peering into parked cars as he walked away from the scene of the attempted robbery. Like the evidence that Castillo-Lopez possessed a possible burglary tool, evidence that he was stopping to look into parked cars—presumably to determine their contents—is evidence that Castillo-Lopez was walking through the neighborhood with the intent to steal something, and that M.M. thus correctly understood that he wanted to take

24

her purse. Further, the testimony from M.M.'s sister about Castillo-Lopez's actions as he walked away in the distance was relevant to Castillo-Lopez's level of intoxication—an issue that the jury was instructed it could consider in connection with the attempted robbery count. Specifically, M.M.'s sister explained that at the same time she watched Castillo-Lopez stopping to peer into parked cars, she also saw him stumbling and not walking straight. The trial court could reasonably conclude that the jury should hear a complete description of what M.M.'s sister saw as she watched Castillo-Lopez in the distance if it was going to use that testimony to assess Castillo-Lopez's level of intoxication.

C.  *The Trial Court Properly Denied the Request to Instruct on Brandishing as a Lesser Included Offense to Attempted Robbery*

We next consider Castillo-Lopez's contention that the trial court erred by denying his request to instruct on misdemeanor brandishing (§ 417, subd. (a)(1)) as a lesser included offense to attempted robbery. The Penal Code describes the crime of brandishing as follows: "Every person who, except in self-defense, in the presence of any other person, draws or exhibits any deadly weapon whatsoever, other than a firearm, in a rude, angry, or threatening manner, or who in any manner, unlawfully uses a deadly weapon other than a firearm in any fight or quarrel is guilty of a misdemeanor . . . ." (§ 417, subd. (a)(1).)

" 'An instruction on a lesser included offense must be given . . . if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense, but not the greater, charged offense.' . . . 'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' " (*People v. Nelson* (2016) 1 Cal.5th 513, 538.) The trial court denied defense counsel's request to instruct on brandishing as a lesser included

25

offense because it determined that the crime of brandishing did not qualify as a lesser included offense of attempted robbery. As we will explain, we agree with the trial court's conclusion.

"To determine if an offense is lesser and necessarily included in another offense for this purpose, we apply either the elements test or the accusatory pleading test. 'Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former. Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.' " (*People v. Shockley* (2013) 58 Cal.4th 400, 404 (*Shockley*).)

Castillo-Lopez does not dispute that, under *the elements test*, brandishing is *not* a lesser included offense of attempted robbery. This is because the force or fear necessary to commit attempted robbery can be supplied by an act other than brandishing a weapon.[9]

Castillo-Lopez argues, however, that brandishing qualifies as a lesser included offense under the "expanded accusatory pleading test" employed by the Sixth District in *People v. Ortega* (2015) 240 Cal.App.4th 956, 967-970 (*Ortega*). Normally, the accusatory pleading test looks only at the accusatory pleading itself to determine whether the facts actually alleged include all of the elements of the lesser offense. (*Shockley*, *supra*, 58 Cal.4th at p. 404.)

---

[9] The jury was instructed with the following elements of robbery: "1. The defendant took property that was not his own; [¶] 2. The property was in the possession of another person; [¶] 3. The property was taken from the other person or her immediate presence; [¶] 4. The property was taken against that person's will; [¶] 5. The defendant used force or fear to take the property or to prevent the person from resisting; [¶] AND [¶] 6. When the defendant used force or fear, he intended to deprive the owner of the property permanently."

26

However, *Ortega* set forth an "expanded accusatory pleading test" under which "[t]he evidence adduced at the preliminary hearing must be considered in applying the accusatory pleading test when the specific conduct supporting a holding order establishes that the charged offense necessarily encompasses a lesser offense." (*Ortega*, at pp. 967-970.)

It is undisputed that brandishing would not qualify as a lesser included offense of attempted robbery under the *standard* accusatory pleading test, as the charging document does not allege that Castillo-Lopez exhibited the machete in a rude, angry or threatening manner, and not in self-defense, However, Castillo-Lopez contends that the opposite conclusion is required if *Ortega*'s expanded accusatory pleading test is applied. According to Castillo-Lopez, based on M.M.'s testimony at the preliminary hearing that Castillo-Lopez "exhibited the machete . . . in a way that scared her . . . , and her description of events [that] proved he didn't act in self-defense," he was "put . . . on notice that the attempted robbery's force-or-fear element depended on conduct that established the lesser-included offense of misdemeanor brandishing."

We conclude that Castillo-Lopez's argument is without merit because case law, including from this court, has uniformly rejected *Ortega*'s expanded accusatory pleading test. (*People v. Alvarez* (2019) 32 Cal.App.5th 781, 787 (*Alvarez*); *People v. Macias* (2018) 26 Cal.App.5th 957, 964; *People v. Munoz* (2019) 31 Cal.App.5th 143, 158.)

As we explained in *Alvarez*, *supra*, 32 Cal.App.5th 781, *Ortega* was wrongly decided because, among other things, it conflicts with our Supreme Court's description of the accusatory pleading test. As our Supreme Court stated in *People v. Montoya* (2004) 33 Cal.4th 1031, 1036, "Consistent with the primary function of the accusatory pleading test—to determine whether a

27

defendant is entitled to instruction on a lesser uncharged offense—we consider *only* the pleading for the greater offense." Further, as we explained in *Alvarez*, "*Montoya* disapproved of *People v. Rush* (1993) 16 Cal.App.4th 20, which considered evidence from the preliminary hearing in applying the accusatory pleading test," but "*Ortega* did not cite *Montoya* or attempt to reconcile its analysis." (*Alvarez*, at p. 788.) As we concluded in *Alvarez*, "[a]s an intermediate appellate court, we are required to follow Supreme Court precedent" and thus " 'we are not to look beyond the language of the accusatory pleading itself in assessing lesser included offenses.' " (*Ibid*.)

We follow our opinion in *Alvarez* here, and we accordingly conclude that there is no merit to Castillo-Lopez's contention that the jury should have been instructed with brandishing as a lesser included offense of attempted robbery based on the expanded accusatory pleading test.

D. *The Trial Court Did Not Err by Failing to Instruct That the Jury Could Consider Voluntary Intoxication in Deciding Whether Castillo-Lopez Resisted, Delayed or Obstructed a Peace Officer*

Castillo-Lopez next contends that the trial court should have instructed the jury that it could consider voluntary intoxication when determining whether he committed the crime of resisting, delaying or obstructing a peace officer. (§ 148, subd. (a)(1).)[10]

We begin with the factual and procedural background relevant to the issue. At trial, the jury heard evidence to support a finding that Castillo-Lopez was intoxicated while committing the crimes with which he was

---

10    Section 148, subdivision (a)(1) states, "Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician, . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed" is guilty of a misdemeanor.

charged.  Specifically, M.M. testified that Castillo-Lopez appeared "very much" intoxicated during her interaction with him.  M.M.'s sister described Castillo-Lopez as "drunk" and stated that when she watched Castillo-Lopez walk away in the distance, he was stumbling and not walking straight.  One of the police officers who arrested Castillo-Lopez stated that he saw some possible signs of either drug or alcohol intoxication, including Castillo-Lopez's nonsensical statements, glassy watery eyes, erratic and agitated behavior, and rapid speech.  A second police officer testified that, initially, Castillo-Lopez was acting "a little crazy, a little erratic" which could have been a sign of intoxication, but the officer did not note any signs of intoxication once Castillo-Lopez was handcuffed.  He also noted that Castillo-Lopez was able to understand and respond to questions.

During motions in limine, defense counsel requested an instruction on voluntary intoxication.  At the close of the evidence, the trial court and counsel held a conference on jury instructions, at which the trial court indicated that it would instruct with CALCRIM No. 3426 regarding voluntary intoxication as requested by defense counsel.  However, during the conference, defense counsel clarified that he believed voluntary intoxication was relevant only to attempted robbery as charged in count 1, and not to the charge in count 2 that Castillo-Lopez resisted, delayed or obstructed a peace officer in violation of section 148, subdivision (a)(1).  The trial court indicated that it would modify CALCRIM No. 3426 by stating that voluntary intoxication was not a defense to count 2.  Specifically, the court and defense counsel engaged in the following discussion:

"THE COURT:  All right.  Number 3426, voluntary intoxication.

"[DEFENSE COUNSEL]:  I think it's not a defense to the 148.

29

"THE COURT:  Okay.  I'm just going to say Count 2, period.  Is that all right?

"[DEFENSE COUNSEL]:  Yes."

The jury was therefore instructed as follows regarding voluntary intoxication:

"• You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted or failed to act with specific intent to permanently deprive a person of their property.

"• A person is voluntarily intoxicated if he becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect.

"• In connection with the charge of Count 1, and the lesser included charge of Larceny the People have the burden of proving beyond a reasonable doubt that the defendant acted with specific intent.  If the People have not met this burden, you must find the defendant not guilty of Count 1 and the lesser included charge of Larceny.

"• You may not consider evidence of voluntary intoxication for any other purpose.

"• Voluntary intoxication is not a defense to Count 2."

Castillo-Lopez contends that this instruction was legally incorrect because the jury should also have been permitted to consider voluntary intoxication in connection with count 2.  Specifically, Castillo-Lopez contends that voluntary intoxication could be considered in determining whether he *had actual knowledge* that the person he was resisting, delaying or obstructing was a peace officer.

30

As an initial matter, we note that although defense counsel requested that count 2 be *omitted* from the voluntary intoxication instruction, Castillo-Lopez's challenge to the instruction is nevertheless cognizable on appeal. "A trial court has no sua sponte duty to instruct on the relevance of intoxication, but if it does instruct, as the court here did, it has to do so correctly." (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1134.) "We may review the validity of an instruction initially requested by the defense where counsel's actions in seeking or not objecting to the instruction constitutes *simply neglect or mistake*. [Citation.] The trial court does have a duty to correctly instruct the jury on principles of law relevant to issues raised by the evidence in a criminal case." (*People v. Hernandez* (1988) 47 Cal.3d 315, 353, italics added.) The doctrine of invited error holds that a "defendant may not be entitled to challenge a requested instruction where the record clearly reflects that counsel had *a deliberate tactical purpose* in requesting it." (*Ibid.*, italics added.) However, "[t]he invited error doctrine will not preclude appellate review if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction." (*People v. Moon* (2005) 37 Cal.4th 1, 28.) Here, as the record does not suggest any deliberate tactical purpose for defense counsel's request to omit count 2 from the voluntary intoxication instruction, we will review the instruction for legal error.

There are two fundamental premises to Castillo-Lopez's argument that the jury should have been instructed to consider voluntary intoxication in determining whether he resisted, delayed or obstructed an officer in violation of section 148, subdivision (a)(1).

First, relying primarily on this court's decision in *People v. Reyes* (1997) 52 Cal.App.4th 975 (*Reyes*), Castillo-Lopez contends that a jury may consider voluntary intoxication if the offense at issue requires a finding that the

31

defendant had *actual knowledge* when committing the crime. Specifically, *Reyes* held that for the crime of receiving stolen property, the jury could consider voluntary intoxication when deciding whether the defendant *had actual knowledge* that the property at issue was stolen. (*Id.* at pp. 985-986.) While acknowledging that a recent opinion has cautioned against relying upon *Reyes* (*People v. Berg* (2018) 23 Cal.App.5th 959, 969), Castillo-Lopez argues that *Berg* was wrongly decided and is not persuasive.[11] As will become apparent, we need not further examine the validity of Castillo-Lopez's first premise, or his reliance on *Reyes*, because his second premise is unsound.

As his second premise, Castillo-Lopez contends that, like the offense of receiving stolen property in *Reyes*, *supra*, 52 Cal.App.4th 975, the crime of resisting, delaying or obstructing an officer in violation of section 148, subdivision (a)(1) includes the element of *actual knowledge*. Specifically, he contends that the jury must find that the defendant had actual knowledge

---

[11] The purposes for which a jury may consider voluntary intoxication is governed by section 29.4, subdivision (b), which provides: "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." As our Supreme Court explained in *People v. Atkins* (2001) 25 Cal.4th 76, "[e]vidence of voluntary intoxication is inadmissible to negate the existence of general criminal intent." (*Id.* at p. 81.) " 'A crime is characterized as a "general intent" crime when the required mental state entails only an intent to do the act that causes the harm; a crime is characterized as a "specific intent" crime when the required mental state entails an intent to cause the resulting harm.' " (*Id.* at p. 86.) *Reyes* held that "with regard to the element of knowledge, receiving stolen property is a 'specific intent crime,' " for the purpose of determining whether evidence of voluntary intoxication is admissible. (*Reyes*, *supra*, 52 Cal.App.4th at p. 985.)

32

that the person he or she was resisting, delaying or obstructing was a peace officer.

However, that argument stands in opposition to the long-standing rule, first set forth in *People v. Lopez* (1986) 188 Cal.App.3d 592, 599 (*Lopez*), that instead of requiring *actual knowledge*, section 148, subdivision (a)(1) incorporates a knowledge requirement based on "that of actual knowledge *or what a reasonable person should have known*." (Italics added.) As *Lopez* explained, because the reasonable person standard is involved, "[t]his is an objective standard for measuring the knowledge of the actor," not a subjective standard. (*Ibid*.) In the context of section 148, subdivision (a)(1), this standard has been cited in numerous subsequent cases (see, e.g., *People v. Simons* (1996) 42 Cal.App.4th 1100, 1108-1109; *In re Muhammed C.* (2002) 95 Cal.App.4th 1325, 1329; *In re Chase C.* (2015) 243 Cal.App.4th 107, 113). It has also been endorsed by our Supreme Court. As stated in *Yount v. City of Sacramento* (2008) 43 Cal.4th 885, 894-895 (*Yount*), the "legal elements" of violating section 148, subdivision (a)(1), "are as follows: ' "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew *or reasonably should have known* that the other person was a peace officer engaged in the performance of his or her duties." ' " (Italics added.) The long-standing rule is reflected in CALCRIM No. 2656, which was given to the jury in this case. As that instruction states, the jury is required to find that "[w]hen the defendant acted, he knew *or reasonably should have known*, that [the officers] were police officers performing or attempting to perform their duties." (Italics added.)

Nevertheless, in advocating that we depart from the long-standing rule regarding the knowledge required for a violation of section 148, subdivision

(a)(1), Castillo-Lopez relies on the Sixth District's opinion in *In re A.L.* (2019) 38 Cal.App.5th 15 (*A.L.*), which held that "[a] defendant's actual knowledge that an officer is engaged in the performance of a duty is required by the plain language of . . . section[ ] . . . 148, subdivision (a)(1)." (*A.L.*, at p. 25.) As *A.L.* observed, the language of the statute makes it a crime to "*willfully* resist[ ], delay[ ], or obstruct[ ] any . . . peace officer . . . in the discharge or attempt to discharge any duty." (§ 148, subd. (a)(1), italics added.) *A.L.* reasoned as follows:

> "Willfully is most naturally read as synonymous with knowingly, because ' "the term 'willfully' . . . imports a requirement that 'the person knows what he is doing.' " ' (*People v. Garcia* (2001) 25 Cal.4th 744, 752 [(*Garcia*)], quoting *People v. Honig* (1996) 48 Cal.App.4th 289, 334.) When 'willfully' is the mental state required for a crime, the perpetrator must have actual knowledge of the relevant facts. (*In re Jerry R.* (1994) 29 Cal.App.4th 1432, 1437 [(*Jerry R.*)].) Therefore, . . . section 148, subdivision (a)(1) . . . requires that a defendant have actual knowledge he or she is resisting an officer in the performance of duty." (*A.L.,* at p. 22.)

The year after it was issued, *A.L.* was criticized and rejected by a different panel of the Sixth District in *People v. Mackreth* (2020) 58 Cal.App.5th 317. *Mackreth* explained that, for several reasons, "[a]pplication of the rules of statutory construction to section 148, subdivision (a)(1) inescapably leads to a conclusion that the Legislature did *not* intend for its use of the word 'willfully' here to create a requirement of 'actual knowledge.' " First, the court explained, "the word 'willfully' is defined in the Penal Code, and its definition does not encompass a requirement of actual knowledge." (*Id.* at p. 330.) Second, examining the legislative history of both section 148, subdivision (a)(1) and another similar statute that criminalizes resisting an officer (§ 69), the court noted that "simultaneously enacting these two related statutes in 1872 and using 'willfully' to describe the required mental state for

34

a section 148 offense but 'knowingly' to describe the required mental state for a section 69 resisting offense, the Legislature clearly expressed its decision to require *different* mental states for the two offenses." (*Mackreth*, at p. 331.) Third, the court found it significant that in 1997 the Legislature amended "section 148 to add subdivision (a)(2), which uses 'knowingly and maliciously' to describe the mental state required for the related offense of disrupting, impeding, or interfering with a police communication," providing "further evidence of the Legislature's recognition that 'willfully' in section 148, subdivision (a)(1) is not equivalent to actual knowledge." (*Mackreth*, at p. 331.) Finally, looking again to the Legislature's 1997 amendment, the court noted that because the amendment took place long after the court in *Lopez*, *supra*, 188 Cal.App.3d 592, held that section 148, subdivision (a)(1) did not require actual knowledge, the Legislature's failure to alter the "willfully" language of section 148, subdivision (a)(1) in light of *Lopez* was "another strong indicator that the Legislature did not intend for a section 148, subdivision (a)(1) offense to require actual knowledge." (*Mackreth*, at p. 332.)

*Mackreth* then persuasively distinguished the cases upon which *A.L.* relied for the rule that a statutory reference to "willfully" generally refers to actual knowledge. (*Mackreth*, *supra*, 58 Cal.App.5th at pp. 333-334 [discussing *Garcia, supra*, 25 Cal.4th 744 & *Jerry R.*, *supra*, 29 Cal.App.4th 1432].) *Mackreth* concluded, "[b]ased on our application of the rules of statutory construction and our review of the statute's legislative history, we hold that section 148, subdivision (a)(1) does not require actual knowledge. We therefore respectfully disagree with and decline to follow *A.L.*" (*Mackreth*, at p. 334.)

We find *Mackreth*'s analysis to be persuasive and we adopt it here. We will accordingly follow the long-standing approach under which section 148,

35

subdivision (a)(1) does not require a finding that the defendant acted with actual knowledge that peace officers were involved. Instead, the proper inquiry is whether " ' "the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." ' " (*Yount, supra,* 43 Cal.4th at p. 895.)

As a result of this analysis, it is clear that the second premise of Castillo-Lopez's argument fails because a defendant can violate section 148, subdivision (a)(1) without *actual knowledge* that a peace officer was the target of the resistance. Because one of the fundamental premises of Castillo-Lopez's argument cannot stand, we reject his contention that the jury should have been instructed that it could consider voluntary intoxication when deciding whether Castillo-Lopez had the requisite state of mind for the charge of resisting, delaying or obstructing a peace officer in count 2.[12]

---

[12] Castillo-Lopez relies upon the statement in *People v. Moore* (2018) 19 Cal.App.5th 889, 894 that "the crime of resisting arrest requires the perpetrator to know the person they are resisting is an officer, and thus evidence of voluntary intoxication is admissible to show the defendant did not know." Castillo-Lopez also cites *People v. Quarles* (2018) 25 Cal.App.5th 631, 635, which quotes that language from *Moore.* However, the statements in *Moore* and in *Quarles* were dicta, as neither case concerned the crime of resisting arrest. *Moore* was a prosecution for vandalism (*Moore,* at p. 893), and *Quarles* was a prosecution for damaging a telephone line or mechanical equipment connected to the line (*Quarles,* at p. 634). In support of its statement, *Moore* cited *Lopez, supra,* 188 Cal.App.3d at pages 599-600, and *Reyes, supra,* 52 Cal.App.4th at pages 985-986. *Quarles,* in turn, quoted *Moore.* (*Quarles,* at p. 635.) The cases cited by *Moore* plainly do not stand for the proposition that evidence of voluntary intoxication is admissible in a prosecution for resisting arrest in violation of section 148, subdivision (a)(1). We therefore assign no weight to the dicta in *Moore* and *Quarles* when analyzing whether the jury should have been instructed to consider voluntary intoxication in connection with count 2.

E.	*Castillo-Lopez Is Entitled to Resentencing Due to Recent Legislation Generally Limiting Felony Probation to a Period of No More Than Two Years*

The next issue is the impact of the Legislature's recent enactment of Assembly Bill No. 1950 on the term of Castillo-Lopez's probation.

At the time Castillo-Lopez was sentenced, section 1203.1, subdivision (a) provided that a court may impose felony probation "for a period of time not exceeding the maximum possible term of the sentence." It further provided that "where the maximum possible term of the sentence is five years or less, then the period of suspension of imposition or execution of sentence may, in the discretion of the court, continue for not over five years." (Former § 1203.1, subd. (a).) Accordingly, the trial court ordered a three-year term of probation for Castillo-Lopez.

During the pendency of this appeal, the Legislature enacted Assembly Bill No. 1950, which amended section 1203.1. (Stats. 2020, ch. 328, § 2.) Subject to exceptions not applicable here, section 1203.1, subdivision (a), as amended, provides that a felony probation term cannot exceed two years. The provision now states, "The court, or judge thereof, in the order granting probation, may suspend the imposing or the execution of the sentence and may direct that the suspension may continue for a period of time not exceeding two years, and upon those terms and conditions as it shall determine." (§ 1203.1, subd. (a).)

Castillo-Lopez argues that because his case is not yet final, under the principles of retroactivity applicable to ameliorative changes to the criminal law as set forth in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), he is entitled under Assembly Bill No. 1950 to have his term of probation reduced from three years to two years. The People explain that in light of several recent published decisions on the issue, they do not contest the application of the

statutory amendment implemented by Assembly Bill No. 1950 to cases, like Castillo-Lopez's, that are not yet final.

Based on this court's opinion in *People v. Sims* (2021) 59 Cal.App.5th 943 (*Sims*), we will retroactively apply Assembly Bill No. 1950 here. As we stated in *Sims*, "the two-year limitation on felony probation set forth in Assembly Bill No. 1950 is an ameliorative change to the criminal law that is subject to the *Estrada* presumption of retroactivity," and "[t]herefore . . . the two-year limitation applies retroactively to all cases not reduced to final judgment as of the new law's effective date." (*Sims*, at p. 964.)

In *Sims*, instead of modifying the term of probation, we remanded for resentencing, stating that "defendant is entitled to seek a reduced probation term on remand under Assembly Bill No. 1950." (*Sims, supra*, 59 Cal.App.5th at p. 964.) We will follow the procedure employed in *Sims*, and we will therefore remand to the trial court with directions that Castillo-Lopez be resentenced based on the current state of the law, as enacted by Assembly Bill No. 1950.

F. *On Remand, the Trial Court May Expressly Consider Castillo-Lopez's Inability to Pay the Fines and Fees Imposed on Him at Sentencing*

The final issue is whether the trial court sufficiently considered Castillo-Lopez's inability to pay when it imposed certain fines and fees at sentencing. As we will explain, because the record is unclear as to whether the trial court did so, we direct the trial court to expressly address the issue on remand.

We begin with the relevant proceedings in the trial court. At the sentencing hearing, defense counsel asked that the trial court take into account Castillo-Lopez's inability to pay when imposing fines and fees: "Your Honor, prior to the incident, and prior to my client going into custody he was transient, living on the streets. He was not employed. Well, he did collect

38

recyclables for spare change, Your Honor. However, at this time he does not have an ability to pay. I'd ask the court to take that into consideration when ordering fines and fees in this case."

The trial court did not conduct any further inquiry into Castillo-Lopez's ability to pay, but it mentioned inability to pay when identifying *one* of the *fees* at issue. Specifically, the trial court first identified the *fines* it was imposing: "[a] restitution fine of $300, which is the minimum," together with an administration fee of $30 and a suspended probation revocation restitution fine of $300. The trial court then went on to describe the *fees* it was imposing. "A court security fee of $40 is imposed pursuant to section 1465.8 of the Penal Code. The additional security fee is waived by the court. A criminal conviction assessment of $30 is imposed pursuant to section 7[0]373 of the Government Code. The additional $30 is waived by the court. You're ordered to pay a $129.75 criminal justice administration fee. *In fact, the court is going to strike that particular fee in light of your inability to pay.* A presentence investigation fee, however, will be ordered in the amount of $100. That's imposed pursuant to section 1203.1(b) of the Penal Code. And a probation supervision fee of $30 per month is also ordered, and that's imposed pursuant to section 1203.1(b) of the Penal Code." (Italics added.)

In *Dueñas, supra,* 30 Cal.App.5th 1157, the court held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes court facilities and court operations assessments under . . . section 1465.8 and Government Code section 70373" and that, "although . . . section 1202.4 bars consideration of a defendant's ability to pay unless the judge is considering increasing the fee over the statutory minimum, the execution of any restitution fine imposed under this statute must be stayed unless and until the trial court holds an

39

ability to pay hearing and concludes that the defendant has the present ability to pay the restitution fine." (*Dueñas*, at p. 1164.) Numerous subsequent cases have addressed the issues presented in *Dueñas*, and the validity of *Dueñas* will be decided by our Supreme Court in currently pending cases. (E.g., *People v. Kopp*, 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.)

Castillo-Lopez contends that, based on the due process considerations discussed in *Dueñas*, *supra*, 30 Cal.App.5th 1157, the trial court should not have imposed any of the fines and fees on him unless it concluded that he had an ability to pay them.[13] The People do not address whether they agree with *Dueñas*'s holding that principles of due process apply when determining whether *fees* should be reduced or stricken based on inability to pay. Instead, without addressing their position on *Dueñas* with respect to the imposition of fees, the People contend that the record shows that the trial court *did* consider Castillo-Lopez's ability to pay when imposing the fees.

Turning to the issue of the restitution *fine*, the People agree that inability to pay is relevant when fines are imposed, but only as *one component* of an analysis conducted under the excessive fines clause of the Eighth Amendment. Indeed, "California courts have . . . held that ability to pay is relevant to excessiveness, and they have done so in applying both the Eighth Amendment and article I, section 17 of the California Constitution." (*People v. Cowan*, 47 Cal.App.5th 32, 47, review granted June 17, 2020,

---

[13]   Castillo-Lopez was sentenced on December 16, 2019. *Dueñas* was filed January 8, 2019. The Supreme Court granted review in *Kopp* on November 13, 2019. (*Kopp*, *supra*, 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.) Thus, the trial court would likely have been aware that when defense counsel cited Castillo-Lopez's inability to pay, he was invoking the principles set forth in *Dueñas* and subsequent case law.

S261952 [citing *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728].)

Based on our review of the record, it is unclear whether the trial court applied the constitutional principles set forth in *Dueñas*, *supra*, 30 Cal.App.5th 1157 and subsequent case law when considering whether Castillo-Lopez's inability to pay should result in certain fines and fees being reduced or stricken. Indeed, we note that the only fee that the trial court struck based on inability to pay was the criminal justice administration fee referred to in former Government Code section 29550.2. However, that statute *expressly* permitted a court to decline to impose the fee based on the defendant's inability to pay, stating that "[*i*]*f the person has the ability to pay*, a judgment of conviction shall contain an order for payment of the amount of the criminal justice administration fee by the convicted person." (Former Gov. Code, § 29550.2, subd. (a).) Accordingly, it is possible that the trial court may have limited its consideration of inability to pay to those statutes that expressly authorize such an approach, rather than also considering the constitutional principles discussed in *Dueñas* and subsequent case law.

As we are unable to determine whether the trial court took into account the constitutional principles discussed in *Dueñas*, *supra*, 30 Cal.App.5th 1157 and subsequent case law, we will direct that, on remand, the trial court should expressly consider the current case law governing the issues raised by *Dueñas*, receive any relevant updated evidence regarding Castillo-Lopez's financial condition, and based thereon, expressly decide whether any of the fines or fees should be reduced or stricken based on an inability to pay.

41

DISPOSITION

The true finding on the one-year enhancement for personally using a deadly or dangerous weapon is reversed. This matter is remanded with directions that the trial court (1) resentence Castillo-Lopez consistent with the two-year limitation on terms of felony probation set forth in the current version of section 1203.1, subdivision (a); and (2) expressly decide, based on the constitutional principles discussed in *Dueñas*, *supra*, 30 Cal.App.5th 1157 and subsequent case law, whether to reduce or strike certain of the fines and fees it imposed at sentencing in light of Castillo-Lopez's inability to pay. In all other respects, the judgment is affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


O'ROURKE, J.